# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed On: June 18, 2019

No. 17-7064

ALAN PHILIPP, ET AL.,
APPELLEES

v.

FEDERAL REPUBLIC OF GERMANY, A FOREIGN STATE AND
STIFTUNG PREUSSISCHER KULTURBESITZ,
APPELLANTS

———

Consolidated with 17-7117

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:15-cv-00266)

———

On Petition for Rehearing En Banc

———

Before: GARLAND, *Chief Judge*; HENDERSON,
ROGERS, TATEL, GRIFFITH, SRINIVASAN, MILLETT, PILLARD,
WILKINS, KATSAS\*\*, AND RAO\*, *Circuit Judges*.

**O R D E R**

Appellants' petition for rehearing en banc, the
response thereto, and the amicus curiae brief in

support of rehearing en banc were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk
BY: /s/
Ken R. Meadows
Deputy Clerk

\* Circuit Judge Rao did not participate in this matter

\*\* A statement by Circuit Judge Katsas, dissenting from the denial of rehearing en banc, is attached.

KATSAS, *Circuit Judge*, dissenting from the denial of rehearing en banc:

The panel decision in this case, together with *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016) (*Simon I*), and *Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018) (*Simon II*), makes the district court sit as a war crimes tribunal to adjudicate claims of genocide arising in Europe during World War II. The basis for these decisions is not any federal statute authorizing a private right of action for victims of foreign genocide, nor even any statute punishing foreign genocide under United States law. Rather, these decisions rest on a statute abrogating the jurisdictional immunity of foreign sovereigns from claims for unlawful takings of property. As a result, the district court must hear genocide claims against foreign sovereigns, but only to determine whether it has subject-matter jurisdiction over common-law tort claims for conversion and the like. Moreover, the plaintiffs bringing these genocide-based takings claims may recover neither for killings nor even for personal injuries, but only for the loss of their property. And the district court must adjudicate these claims— and thus effectively determine the scope of a genocide— without first affording the foreign sovereign an opportunity to provide redress, whether for genocide or conversion.

Before allowing this remarkable scheme to proceed further, we should reconsider it en banc. In this case, *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018), and in *Simon II*, we rejected any defense of exhaustion or comity-based abstention for claims under the Foreign Sovereign Immunities Act (FSIA). These decisions create a clear split with the Seventh Circuit, are in tension with decisions from the Ninth and Eleventh Circuits, disregard the views of the Executive Branch on a matter of obvious foreign-policy sensitivity, and make the FSIA more amenable to human-rights litigation against foreign sovereigns than the Alien Tort Statute (ATS) is to human-rights litigation against

private defendants abetting the sovereigns. Moreover, they clear the way for a wide range of litigation against foreign sovereigns for public acts committed within their own territories. This includes claims not only for genocide, but also for the violation of most other norms of international human-rights law. The consequences of *Simon I* and its progeny are thus dramatic, while their foundations are shaky.

I

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" in the FSIA itself. 28 U.S.C. § 1604. It then provides that a "foreign state shall not be immune from the jurisdiction of courts of the United States or of the States" when certain exceptions apply. *Id.* § 1605. The exception at issue here, commonly called the "expropriation exception," applies to any case

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

*Id.* § 1605(a)(3).

In *Simon I*, this Court held that the expropriation exception covers property taken as part of a genocide. We reasoned that genocide includes deliberately inflicting on a protected group

"conditions of life calculated to bring about its physical destruction." 812 F.3d at 143 (quotation marks omitted). We held that the complaint at issue, which described the experience of Jews in Hungary between 1941 and 1944, adequately alleged "the requisite genocidal acts and intent," including a "systematic, 'wholesale plunder of Jewish property'" that "aimed to deprive Hungarian Jews of the resources needed to survive as a people." *Id.* at 143–44 (citation omitted). We recognized that the international law of expropriation applies only to takings by one sovereign of property owned by nationals of another. *Id.* at 144. But we distinguished the prohibition against genocide, which encompasses acts committed by a sovereign "against its own nationals." *Id*. at 145. We also acknowledged that, for genocide-based expropriation claims, the jurisdictional and merits inquiries diverge: Genocide must be established to create subject-matter jurisdiction, but the merits involve "garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution." *Id.* at 141. As to damages, we noted that another FSIA exception covers claims "for personal injury or death," but only for losses "occurring in the United States." 28 U.S.C. § 1605(a)(5). So, we construed the expropriation exception to permit plaintiffs claiming genocide to "seek compensation for taken property but not for taken lives." 812 F.3d at 146 (quotation marks omitted).

In *Philipp* and *Simon II*, this Court rejected exhaustion, abstention, and *forum non conveniens* defenses to the genocide-based expropriation claims recognized in *Simon I*. In *Philipp*, the panel held that the FSIA, by comprehensively codifying rules for foreign sovereign immunity, foreclosed any requirement that plaintiffs exhaust remedies available in the courts of the defendant sovereign. 894 F.3d at 414–16. *Simon II* reaffirmed that holding. There, we stated that, unlike other common-law defenses preserved by the FSIA, exhaustion

"lacks any pedigree in domestic or international common law." 911 F.3d at 1181. We further reasoned that, if an exhaustion requirement would preclude the plaintiffs from returning to federal court (as would a comity-based abstention requirement), that would only make exhaustion more like immunity. *Id.* at 1180. Then, we held that the district court abused its discretion in dismissing the claims on *forum non conveniens* grounds, even though they involved acts perpetrated by the Hungarian government against Hungarian nationals in Hungary. *Id.* at 1181–90.

## II

### A

The expropriation exception applies to claims for "property taken in violation of international law." 28 U.S.C. § 1605(a)(3). *Simon I* held that this provision encompasses property taken in violation of the international-law prohibition against genocide. In my judgment, it encompasses only property taken in violation of international takings law. The literal language could bear either meaning, but statutes must be construed in context. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). Here, several contextual considerations support the narrower reading.

To begin, genocide is not about the taking of property. Rather, it involves the attempted extermination of a national, ethnic, racial, or religious group. A United Nations convention defines genocide as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial, or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm

to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part.

Convention on the Prevention and Punishment of the Crime of Genocide art. 2, Dec. 9, 1948, 78 U.N.T.S. 277. *Simon I* reasoned that takings may have a genocidal intent, and thus meet the last prong of this definition. 812 F.3d at 143–44. But they still must be intended to cause the "physical destruction" of a group—what matters is the attempted mass murder. And if genocide involves attempted mass murder, a provision keyed to "property taken" would be a remarkably elliptical way of addressing it. *See*, *e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

It would be even stranger for Congress to address genocide as exclusively a property offense. The FSIA's expropriation exception encompasses only claims for "property," 28 U.S.C. § 1605(a)(3), whereas its separate tort exception, which encompasses claims "for personal injury or death," covers only harms "occurring in the United States," *id.* § 1605(a)(5). So, *Simon I* approved an exceedingly odd type of genocide claim— one for property harms but *not* for personal injury or death. Moreover, the expropriation exception requires a connection between the property taken and commercial activity in the United States: the property or its proceeds must either be "present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or "owned or operated by an agency or instrumentality of the foreign state" that is itself "engaged in a commercial activity in the United States." *Id.* § 1605(a)(3). These requirements would make little sense in a provision addressed to human-rights abuses such as genocide, rather than to purely economic wrongdoing.

As strange is the mismatch between jurisdiction and merits. *Simon I* requires proof of genocide to abrogate sovereign immunity—which must be determined at the outset. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318–24 (2017). But abrogating immunity does not create a private right of action, *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004), and there is no common-law right of action for genocide. Instead, the merits here involve "'garden-variety common-law' claims," such as "replevin, conversion, unjust enrichment, and bailment." *Philipp*, 894 F.3d at 410–11 (citation omitted); *see also Simon I*, 812 F.3d at 141. This scheme oddly matches the jurisdictional equivalent of a thermonuclear weapon (determining the scope of a genocide) to the merits equivalent of swatting a fly (determining whether there was a common-law conversion). And it is in marked contrast to the FSIA's terrorism exception, which applies to claims for various specified acts, 28 U.S.C. § 1605A(a)(1), and which creates a cause of action for those acts, *id.* § 1605A(c).

Broader statutory context creates further difficulties. The FSIA's other primary exceptions are narrow ones covering waiver, commercial activity in the United States, rights to property in the United States, torts causing injury in the United States, and arbitration. 28 U.S.C. § 1605(a)(1)–(6). The Supreme Court has described these exceptions as collectively codifying the pre-FSIA "restrictive" theory of foreign sovereign immunity, which covers a sovereign's "public acts" but not its commercial ones. *See Helmerich & Payne*, 137 S. Ct. at 1320–21; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486–89 (1983). In a case specifically involving the expropriation exception, the Court "found nothing in the history of the statute that suggests Congress intended a radical departure from these basic principles." *Helmerich & Payne*, 137 S. Ct. at 1320. Abrogating immunity for public acts

committed by a foreign sovereign against its own nationals within its own territory would be just such a radical departure.

The international law of foreign sovereign immunity cuts in the same direction. Here is its "Basic Rule": "Under international law, a state or state instrumentality is immune from the jurisdiction of the courts of another state, except with respect to claims arising out of activities of the kind that may be carried on by private persons." Restatement (Third) of the Foreign Relations Law of the United States § 451 (1987) (Third Restatement). Like the FSIA, international law provides narrow exceptions to immunity for claims arising out of commercial activity, *id.* § 453(1); torts causing injuries within the forum state, *id.* § 454(1); property claims involving commercial activities, gifts, or immovable property in the forum state, *id.* § 455(1); and waiver, *id*. § 456(1). None of these exceptions covers the genocide-based takings claims recognized in *Simon I*. So, *Simon I* construes the FSIA to conflict with international law—which is to be avoided if possible. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). Of course, none of this suggests that genocide or other violations of international human-rights law should go unremedied; but such violations typically are addressed either through diplomacy or in international tribunals, rather than in the domestic tribunals of another sovereign. *See* Third Restatement § 906 & cmt. *b*.

Consistent with these principles, the courts have rejected attempts to shoehorn modern human-rights law into the FSIA exceptions. For example, in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Supreme Court held that the commercial-activity exception did not cover claims that Saudi Arabia illegally detained and tortured a United States citizen employed by a Saudi government hospital. The Court construed the exception to track the restrictive theory of sovereign immunity:

[T]he intentional conduct alleged here (the Saudi Government's wrongful arrest, imprisonment, and torture of Nelson) could not qualify as commercial under the restrictive theory. The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature.

*Id.* at 361. In *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), we likewise construed the FSIA's waiver exception, which includes waivers "by implication," 28 U.S.C. § 1605(a)(1), to track the restrictive theory. We held that Germany did not impliedly waive its foreign sovereign immunity by using slave labor during the Nazi era. 26 F.3d at 1173. And we did so despite recognizing that slavery—like genocide—violates a *jus cogens* norm of international human-rights law, *i.e.*, "a norm from which no derogation is permitted." *Id.* (quotation marks omitted).

The only deviation from this pattern is the FSIA's terrorism exception, which covers a significant class of cases involving the public acts of a foreign sovereign. But the differences between the terrorism and expropriation exceptions are striking: The terrorism exception meticulously describes and limits the possible plaintiffs (United States nationals, members of the United States armed forces, and United States employees or contractors), 28 U.S.C. § 1605A(a)(2)(A)(ii); the possible defendants (generally, foreign states formally designated as sponsors of terrorism), *id.* § 1605A(a)(2)(A)(i); the acts triggering the exception ("torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act"), *id.* § 1605A(a)(1); the

associated private cause of action (covering the same parties and acts), *id.* § 1605A(c); and the damages available (for personal injury, death, or foreseeable property loss), *id.* § 1605A(a)(1), (d). This carefully reticulated framework is far different from a provision keyed only to "property taken in violation of international law." *Id.* § 1605(a)(3).

B

The grave consequences of *Simon I* bear not only on its correctness, but also on the appropriateness of en banc review.

Most obviously, *Simon I* requires federal courts to determine the scope of genocide committed by various foreign countries during World War II. We suggested that this determination may sometimes be straightforward—as in the case of Hungarian Jews in the early 1940s. *See* 812 F.3d at 142–44. Even so, each individual plaintiff must prove not only that there was a genocide, but also that he or she (or a decedent) was subjected to a genocidal taking. Sometimes, this will be far from clear. For example, the *Philipp* panel concluded that a coerced sale of art in 1935, for "barely 35% of its actual value," could be an act of genocide. 894 F.3d at 409, 413–14 (quotation marks omitted). Germany objected that the plaintiffs' theory would transform into genocide any "'transaction from 1933–45 between' a Nazi-allied government and 'an individual from a group that suffered Nazi persecution.'" *Id.* at 414. The panel envisioned something only slightly less concerning—case-by-case adjudications of which commercial transactions were sufficiently coercive, unfair, and improperly motivated to be genocide. *Id.* Such claims could be made against a number of European nations. *See*, *e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677 (2004); *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc); *Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir.

2005); *Freund v. Republic of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008). And they would create massive exposure. For example, in a case that, like *Simon*, involved Jews who lost property in the Hungarian Holocaust, the damages sought were some $75 billion—"nearly 40 percent of Hungary's annual gross domestic product in 2011." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 682 (7th Cir. 2012).

Moreover, the reasoning of *Simon I* cannot be limited to genocide. International law sharply distinguishes between the law of expropriation, which restricts only the takings by one sovereign of property belonging to the nationals of another, *see* Third Restatement § 712, and human-rights law, which now governs one sovereign's treatment of its own nationals within its own borders, *id.* § 701. Under the latter,

> A state violates international law if, as a matter of state policy, it practices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, or (g) a consistent pattern of gross violations of internationally recognized human rights.

*Id.* § 702. The first six of these seven categories are *jus cogens* norms—the most serious ones, which are binding even in the face of an international agreement to the contrary. *Id.* cmt. *n*. Most of them—including not only genocide, but also slavery, murder, degrading treatment, and systemic racial discrimination—can involve harms to property. Under the reasoning of *Simon I*, all of these could be the subject of litigation through the expropriation exception.

11

To appreciate the gravity of this, consider if the shoe were on the other foot.  Imagine the United States' reaction if a European trial court undertook to adjudicate a claim for tens of billions of dollars for property losses suffered by a class of American victims of slavery or systemic racial discrimination.  Yet that is a precise mirror image of *Simon*.  Given the stakes, what we once said about the waiver exception rings true here:

> We think that something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong.  Such an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations.  In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day— unless disrupted by our courts, that is.

*Princz*, 26 F.3d at 1175 n.1.

### III

*Philipp* and *Simon II* magnify the concerns about *Simon I* and come with their own analytical difficulties.

### A

On the merits, *Philipp* and *Simon II* held that the FSIA forecloses any exhaustion or comity-based abstention defense. 894 F.3d at 414–16; 911 F.3d at 1180–81.  But far from

foreclosing these defenses, the FSIA affirmatively accommodates them. It provides that, for any claim falling within an immunity exception, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. A "private individual" under "like circumstances" would be one facing claims for aiding and abetting violations of international human-rights law. Such claims would be brought under the ATS, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Another like circumstance might involve private individuals sued for wrongful death, battery, or conversion. In either instance, exhaustion and abstention defenses would likely be available.

The Supreme Court has at least hinted that an ATS plaintiff must exhaust local remedies before litigating an international-law tort claim in federal district court. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Court explained:

> the European Commission argues … that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals. We would certainly consider this requirement in an appropriate case.

*Id.* at 733 n.21 (citations omitted). Four justices have embraced exhaustion more definitively—without provoking any disagreement. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1430–31 (2018) (Sotomayor, J., dissenting); *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 133 (2013) (Breyer, J.,

concurring in the judgment). The Ninth Circuit has held that exhaustion is required in ATS cases if local remedies are adequate. *See Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 828–32 (9th Cir. 2008) (en banc) (plurality opinion); *id.* at 833–37 (Bea, J., concurring); *id.* at 840–41 (Kleinfeld, J., concurring).

Private defendants also may seek comity-based abstention. For example, *Mujica v. AirScan, Inc.*, 771 F.3d 580 (9th Cir. 2014), involved ATS and state-law claims against defendants alleged to have abetted the bombing of a Colombian village by the Colombian government. *See id.* at 584. After dismissing the ATS claims as impermissibly extraterritorial, the Ninth Circuit dismissed the state-law claims "based on the doctrine of international comity." *Id.* at 596–97. As the court explained, "[i]nternational comity is a doctrine of prudential abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Id.* at 598 (citation omitted). Likewise, in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004), the Eleventh Circuit dismissed on comity-based abstention grounds a claim by an American citizen that two German banks, during the 1930s and early 1940s, had stolen her family property "through the Nazi Regime's program of 'Aryanization.'" *Id.* at 1229, 1237–40. Comity interests are heightened where, as here, the claims "arise from events of historical and political significance" to the foreign sovereign. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008). Like exhaustion, comity-based abstention presupposes an adequate forum in the offending country. *See*, *e.g.*, *Mujica*, 771 F.3d at 603–04. But *Philipp* and *Simon II* rejected exhaustion and abstention defenses as categorically unavailable in FSIA cases, not on the narrower ground that fora in Germany and Hungary were inadequate.

The *Philipp* panel reasoned that because the FSIA comprehensively sets forth immunity defenses, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141–42 (2014), but does not expressly provide for exhaustion or abstention defenses, it must implicitly have foreclosed those defenses. 894 F.3d at 415–16. But foreign sovereign *immunity*—which eliminates subject-matter *jurisdiction*—is distinct from non-jurisdictional defenses such as exhaustion and abstention. As shown above, these defenses are available to private defendants no less than to foreign sovereigns. In that critical respect, the defenses are less akin to immunity than to generally applicable, judge-made defenses such as *forum non conveniens*, the act-of-state doctrine, and the political-question doctrine—none of which is mentioned in the text of the FSIA, but all of which survived its enactment. *See*, *e.g.*, *Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934, 951 (D.C. Cir. 2008); *Hwang Geum Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005). Exhaustion and abstention are also different from arbitration. So, the inclusion of an arbitration requirement in the terrorism exception, 28 U.S.C. § 1605A(a)(2)(A)(iii); *see Philipp*, 894 F.3d at 415, says nothing about exhaustion or abstention.

*Simon II* further reasoned that exhaustion "lacks any pedigree in domestic or international common law." 911 F.3d at 1181. But international law requires an individual "claiming to be a victim of a human rights violation" to "exhaust[ ] available remedies under the domestic law of the accused state" before another state may espouse his claim. *See* Third Restatement § 703 cmt. *d*. Likewise, individual victims generally have international remedies only as provided by agreement, *see id.* cmt. *c*, and international agreements "also generally require that the individual first exhaust domestic remedies," *id.* cmt. *d*. To be sure, the Third Restatement does not expressly apply the same rule to instances where the victim seeks redress in the courts of a foreign sovereign. *See Philipp*,

894 F.3d at 416. But the drafters would have had no occasion to address exhaustion in that specific circumstance, given the overwhelming likelihood that, under international standards, sovereign immunity would have barred the claims. *See* Third Restatement §§ 451–56. Moreover, the logic for requiring exhaustion is even stronger in the context of actions filed in domestic courts; "if exhaustion is considered essential to the smooth operation of international tribunals whose jurisdiction is established only through explicit consent from other sovereigns, then it is all the more significant in the absence of such explicit consent to jurisdiction." *Sarei*, 550 F.3d at 830 (plurality opinion). As for domestic exhaustion rules, federal courts have crafted them for over a century, out of respect for other sovereigns such as states or Indian tribes. *See, e.g., Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14–15 (1987); *Ex parte Royall*, 117 U.S. 241, 251 (1886).

Finally, *Simon II* reasoned that exhaustion might, by operation of *res judicata*, bar plaintiffs from ever bringing claims in the United States. 911 F.3d at 1180. That is not necessarily true, at least if the plaintiff reserves the right to litigate international claims in the United States after pursuing domestic tort claims elsewhere. *Cf. England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 413–19 (1964). In any event, there is nothing anomalous with exhaustion triggering preclusion. *See, e.g., Iowa Mut.*, 480 U.S. at 19. Moreover, the same objection would apply to exhaustion under the ATS, yet the Ninth Circuit still adopted it. Comity-based abstention does prevent a plaintiff from litigating in a United States forum, yet the courts have applied it to cases involving private defendants facing foreign-centered human-rights claims. The FSIA makes the same defenses also available to foreign sovereigns.

B

*Philipp* and *Simon II* warrant rehearing en banc for several reasons. *First*, they create a circuit split on a sensitive foreign-policy question. The Seventh Circuit has required Hungarian Holocaust survivors to exhaust remedies in Hungary before seeking to litigate under the FSIA's expropriation exception. *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847, 856–66 (7th Cir. 2015); *Abelesz*, 692 F.3d at 678–85. After describing the nearly existential threat of a $75 billion lawsuit, the Seventh Circuit held that "Hungary, a modern republic and member of the European Union, deserves a chance to address these claims." *Abelesz*, 692 F.3d at 682. The *Philipp* panel acknowledged creating a circuit split. 894 F.3d at 416.

*Second*, *Philipp* rejected the position advanced by the United States. *See* 894 F.3d at 416. In *Simon II*, the United States argued at length that "[d]ismissal on international comity grounds" was consistent with the FSIA and "can play a critical role in ensuring that litigation in U.S. courts does not conflict with or cause harm to the foreign policy of the United States." Br. for Amicus Curiae United States at 14–15, *Simon v. Republic of Hungary* (No. 17-7146); *see also id.* at 14–24. The United States again took the same position in supporting rehearing en banc in *Philipp*. Br. for United States as Amicus Curiae in Support of Rehearing En Banc at 3–14. Given the Executive Branch's "vast share of responsibility for the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quotation marks omitted), we should consider its views on this issue with special care.

*Third*, by eliminating various defenses, these decisions heighten concern about *Simon I*. Two important defenses—exhaustion and abstention—are now foreclosed. And if it was an abuse of discretion to dismiss on *forum non conveniens*

grounds the foreign-cubed claims in *Simon II*, *see* 911 F.3d at 1182, then few of these human-rights cases will qualify for that defense. Other possible doctrines for limiting the expropriation exception, *see Altmann*, 541 U.S. at 713 (Breyer, J., concurring), are also unlikely to have much effect: Personal jurisdiction requirements do not apply to foreign sovereigns. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Venue is always proper in the District of Columbia for actions "brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4). The act-of-state doctrine may not apply to Nazi-era claims, *see First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 764 (1972) (plurality opinion); *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954) (per curiam), and generally does not apply to expropriation claims arising after January 1, 1959, *see* 22 U.S.C. § 2370(e)(2). Statutes of limitation may bar some claims arising from World War II, despite inevitable tolling or concealment arguments, but they will have no effect on claims arising from recent alleged human-rights abuses. Finally, *Simon I* itself held that the political-question doctrine does not bar the claims that it approved. *See* 812 F.3d at 149–51.

*Fourth*, these decisions make the FSIA more receptive to human-rights litigation than is the ATS. Under *Simon I*'s broad interpretation of the expropriation exception, most modern ATS claims could be recast as FSIA ones. And after *Philipp*, recasting has significant advantages. For example, ATS claims that a defendant had abetted crimes against humanity by Papua New Guinea must be exhausted. *See Sarei*, 550 F.3d at 824 (plurality opinion). Yet under *Philipp*, the same lawsuit would face no exhaustion requirement if filed directly against Papua New Guinea. ATS claims of abetting atrocities committed by a foreign sovereign within its own territory are impermissibly extraterritorial. *See Kiobel*, 569 U.S. at 111–12, 124–25. Yet

under *Philipp*, the same lawsuits, if filed directly against the foreign sovereigns, might survive on the theory that common-law tort claims have no territorial limit. *Compare Mujica*, 771 F.3d at 591–96 (dismissing ATS claims as extraterritorial), *with id.* at 596–615 (dismissing state-law claims only on comity grounds). Such results are perverse, for FSIA actions against foreign sovereigns raise even greater foreign-policy concerns than do ATS actions against private parties who may abet them.

*Finally*, the mismatch noted above between jurisdictional and merits issues under *Simon I* makes exhaustion even more important. If the federal courts must resolve the scope of a genocide in order to decide garden-variety conversion claims, then so much the better if the foreign sovereign can perhaps resolve the claims by addressing only the merits.

\* \* \* \*

For these reasons, I would grant rehearing en banc to reconsider the approach to the FSIA's expropriation exception set forth in *Simon I*, *Philipp*, and *Simon II*.