# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 20, 2018　　　　Decided December 28, 2018

No. 17-7146

ROSALIE SIMON, ET AL.,
APPELLANTS

v.

REPUBLIC OF HUNGARY AND MAGYAR ALLAMVASUTAK ZRT.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01770)

———

*Paul G. Gaston* argued the cause for appellants. With him on the briefs were *Charles S. Fax*, *Liesel J. Schopler*, *L. Marc Zell*, and *David H. Weinstein*.

*Samuel J. Dubbin* was on the brief for *amici curiae* Holocaust Survivors Foundation USA, Inc., *et al.* in support of plaintiffs-appellants.

*Geoffrey M. Klineberg* and *Daniel S. Severson* were on the brief for *amicus curiae* Professor William S. Dodge in support of plaintiffs-appellants.

*Gregory S. Silbert* argued the cause for appellees. With him on the brief was *Konrad L. Cailteux*.

2

Before: MILLETT, PILLARD, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KATSAS.

MILLETT, *Circuit Judge*:  "Nowhere was the Holocaust executed with such speed and ferocity as it was in Hungary." *Simon v. Republic of Hungary*, 812 F.3d 127, 133 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  More than 560,000 Hungarian Jews—68% of Hungary's pre-war Jewish population—were killed in one year.  *Id*. at 134.  In 1944 alone, a concentrated campaign by the Hungarian government marched nearly half a million Jews into Hungarian railroad stations, stripped them of all their personal property and possessions, forced them onto trains, and transported them to death camps like Auschwitz, where 90% of them were murdered upon arrival.  *Id*. at 133–134.

Fourteen of the very few survivors of the Hungarian government's pogrom (collectively, "Survivors"), including four United States citizens, filed suit against the Republic of Hungary and Magyar Államvasutak Zrt. ("MÁV"), Hungary's state-owned railway company.  As relevant here, the litigation seeks compensation for the seizure and expropriation of the Survivors' property as part of the Hungarian government's genocidal campaign.  *See Simon*, 812 F.3d at 134.

In a prior appeal in this case, we held that Hungary's and MÁV's seizure of the Survivors' property was an act of genocide, and that the Survivors had adequately alleged jurisdiction over MÁV's acts of genocidal expropriation in violation of international law.  *See Simon*, 812 F.3d at 142,

3

147–148. Although the Survivors' first complaint had not sufficiently alleged that jurisdiction existed over Hungary, we noted that they might yet be able to make that showing. *See id*. at 148.

On remand, the district court dismissed the case on two alternative grounds, both of which are at issue here. First, the court held that, regardless of whether the Survivors' claims against Hungary amounted to expropriation, principles of international comity required that the Survivors first try to adjudicate their claims in Hungary. Second, the court held that, under the doctrine of *forum non conveniens*, a Hungarian forum would be so much more convenient for resolution of the claims as to clearly override the Survivors' choice to litigate the case in the United States.

The district court erred on both fronts. Our recent decision in *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018), which post-dated the district court's ruling, squarely rejected the asserted comity-based ground for declining statutorily assigned jurisdiction. With respect to the dismissal on *forum non conveniens* grounds, the district court committed material legal errors at each step of its analysis. A proper application of the relevant factors leaves no basis for designating Hungary the strongly preferred location for this litigation because Hungary is not home to any identified plaintiff, has not been shown to be the source of governing law, lacks a process for remediation recognized by the United States government, and is not the only location of material amounts of evidence. There is, in short, far too little in this record to designate Hungary a more convenient forum than the one chosen by the Survivors. For those reasons, we reverse and remand for further proceedings consistent with this opinion.

4

**I**

**A**

The terrible facts giving rise to this litigation are recounted at length in our first opinion in this case. *See Simon*, 812 F.3d at 132–134. In brief, Hungary "began a systematic campaign of [official] discrimination" against its Jewish population "as early as 1941." *Id.* at 133. At that time, Hungary began rounding up tens of thousands of Jewish citizens and refugees who had fled from surrounding countries, and sending them to internment camps near the Polish border. *Id.*; Second Amended Class Action Complaint ¶ 105, *Simon v. Republic of Hungary*, No. 10-1770 (D.D.C. June 13, 2016), ECF No. 118 ("Second Am. Compl.").

Then, in 1944, the Nazis occupied Hungary and installed a "fanatically anti-Semitic" regime. *Simon*, 812 F.3d at 133. Over the Summer of 1944, Hungary rounded up more than 430,000 Jews for deportation to Nazi death camps, primarily Auschwitz. Second Am. Compl. ¶ 120. With tragic efficiency, Hungarian government officials, including MÁV employees, created a schedule of deportations, along with planned routes and destinations, with four trains running daily. *Id.* ¶ 117. Seventy to ninety people were packed into an individual freight car, so that each train transported 3,000 to 3,500 Hungarian Jews to almost certain death. *Id.* Before the Jews were crammed into the trains, MÁV officials robbed them of all their possessions. *Id.* ¶ 112. According to the Survivors, "[w]ithout the mass transportation provided by the

Defendant [MÁV], the scale of the Final Solution in Hungary would never have been possible." *Id.* ¶ 133.

**B**

The United States traditionally afforded foreign sovereign nations immunity from suit in domestic courts as a matter of "grace and comity." *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004). Given the Political Branches' constitutional expertise in foreign affairs, courts would historically "defer[] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over particular actions against foreign sovereigns and their instrumentalities." *Id.* (internal quotation marks omitted); *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–320 (1936). But over time, conflicting theories on when immunity should apply created "disarray" in the State Department's immunity decisions. *Altmann*, 541 U.S. at 690.

Congress responded in 1976 by enacting the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. The FSIA is a "comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Altmann*, 541 U.S. at 691 (internal quotation marks omitted); *see also id.* ("Congress sought to remedy these problems by enacting the FSIA."). Congress enacted guiding "principles" so that the "courts of the United States" could decide "the claims of foreign states to immunity" on the terms prescribed by Congress. 28 U.S.C. § 1602; *see Altmann*, 541 U.S. at 691 ("The Act * * * transfers primary responsibility for immunity determinations from the Executive to the Judicial Branch.").

The FSIA enumerates specific exceptions to foreign sovereign immunity and confers federal-court jurisdiction over foreign sovereigns in qualifying cases. 28 U.S.C. §§ 1605–1605A. Courts may hear a case only if "one of the exceptions applies" because "subject-matter jurisdiction in any such action depends on that application." *Altmann*, 541 U.S. at 691 (internal quotation marks omitted). Congress was also explicit that, if an exception applies, "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States." 28 U.S.C. § 1605(a).

This case involves the FSIA's expropriation exception to foreign sovereign immunity. Section 1605(a)(3) waives foreign sovereign immunity in cases asserting that "rights in property [were] taken in violation of international law" if "that property or any property exchanged for such property" either (i) "is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (ii) "is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]" 28 U.S.C. § 1605(a)(3).

Application of that exception hinges on a three-part inquiry:

> [1] the claim must be one in which "rights in property" are "in issue";
> [2] the property in question must have been "taken in violation of international law"; and
> [3] one of two commercial-activity nexuses with the United States must be satisfied.

*Simon*, 812 F.3d at 140.

**C**

**1**

The Survivors are four United States citizens—Rosalie Simon, Charlotte Weiss, Rose Miller, and Ella Feuerstein Schlanger—as well as Helen Herman and Helena Weksberg from Canada; Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, and Moshe Perel from Israel; and Vera Deutsch Danos from Australia. Second Am. Compl. ¶¶ 5–9, 14, 22, 27, 28, 39, 41, 49, 65, 73, 81.[1] Seeking some measure of compensation for their injuries, the Survivors filed suit against the Republic of Hungary, MÁV, and Rail Cargo Hungaria Zrt., a private railway company that is the successor-in-interest to the former cargo division of MÁV. *Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 385 (D.D.C. 2014). The Survivors claim that "their possessions and those of their families were taken from them" by the defendants as they boarded trains destined for concentration camps. *Id.* at 386 (internal quotation marks omitted).[2]

There is no dispute that Hungary and MÁV are, respectively, a foreign sovereign and an instrumentality of a

---

[1] Plaintiff Tzvi Zelikovitch passed away while the case was pending, but his three children, who are all Israeli citizens, "have succeeded to his rights, interests and entitlements." Second Am. Compl. at 3 n.1.

[2] The Survivors also seek to certify a class composed of Holocaust survivors similarly wronged by the Hungarian government. The district court has not yet addressed the request for class certification. *See* Order, *Simon v. Republic of Hungary*, No. 10-1770 (D.D.C. Nov. 15, 2010), ECF No. 9.

foreign sovereign whose claims of immunity are governed by the FSIA. *See Simon*, 812 F.3d at 135 (citing 28 U.S.C. § 1603). Earlier in this litigation, the United States government filed a Statement of Interest recommending that Rail Cargo Hungaria Zrt., now nearly 100% owned by an Austrian company, be dismissed from the case because of the United States' "strong support for international agreements with Austria involving Holocaust claims against Austrian companies—agreements that have provided nearly one billion dollars to Nazi victims." Statement of Interest of the United States of America at 1, *Simon v. Republic of Hungary*, No. 10-1770 (D.D.C. July 15, 2011), ECF No. 42. Given the United States' longstanding collaboration with Austria to "develop funds to compensate victims of the Holocaust," including the Austrian General Settlement Fund, the United States maintained that a "suit against [Rail Cargo Hungaria Zrt.] runs contrary * * * to enduring United States foreign policy interests." *Simon*, 37 F. Supp. 3d at 393–394 (internal quotation marks omitted).

The United States government said nothing about any United States policy interest that would support dismissal of the claims against the Republic of Hungary or MÁV. *See generally* United States Statement of Interest.

The district court subsequently dismissed Rail Cargo Hungaria Zrt. as a defendant for lack of personal jurisdiction. *Simon*, 37 F. Supp. 3d at 444. The district court separately dismissed the case against Hungary and MÁV for lack of subject matter jurisdiction. The court reasoned that the Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 ("1947 Treaty"), "provide[d] for an exclusive, extrajudicial mechanism to resolve" the Survivors' claims, and so the court was "constrained by the FSIA to recognize [their] sovereign immunity." *Simon*, 37 F. Supp. 3d at 420.

9

This court reversed. We held that the 1947 Treaty did not preempt the Survivors' suit because there was no express conflict between the Treaty and the Survivors' common-law claims. *Simon*, 812 F.3d at 140. The Treaty established only a "minimum obligation by Hungary" to compensate victims; it did not provide the "exclusive means" by which victims could obtain relief, leaving the Survivors free to pursue other available remedies. *Id.* at 137 (emphasis omitted).

This court also ruled that the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), encompassed the types of common-law claims of conversion, unjust enrichment, and restitution asserted by the Survivors. *Simon*, 812 F.3d at 141 ("We make FSIA immunity determinations on a claim-by-claim basis[.]"). More specifically, we held that the expropriation exception "squarely" applied, *id.* at 146, because Hungary's and MÁV's expropriations of the Survivors' property were "*themselves genocide*," in violation of fundamental tenets of international law, *id.* at 142. "The Holocaust's pattern of expropriation and ghettoization" in Hungary was a "wholesale plunder of Jewish property * * * aimed to deprive Hungarian Jews of the resources needed to survive as a people." *Id.* at 143 (internal quotation marks omitted). Systematically stripping "a protected group" of life's necessities in order to "physical[ly] destr[oy]" them is "genocide." *Id.*

Looking to the complaint, this court held that the Survivors had satisfactorily pled a commercial nexus with respect to MÁV because MÁV engaged in commercial activity in the United States by "maintain[ing] an agency for selling tickets, booking reservations, and conducting similar business" here. *Simon*, 812 F.3d at 147 (internal quotation marks omitted). The complaint's pleadings, however, needed more specificity

to show the type of commercial nexus that would support exercising jurisdiction over Hungary. We remanded for the district court to address that issue. *Id.* at 148. This court also left it to the district court to decide on remand "whether, as a matter of international comity, it should refrain from exercising jurisdiction over [the remaining] claims until the plaintiffs exhaust domestic remedies in Hungary," and whether the doctrine of *forum non conveniens* warranted dismissal. *Id.* at 151.

**2**

Upon their return to district court, the Survivors amended their complaint to allege specific facts regarding Hungary's ongoing commercial activity in the United States, including, among other things, "[t]he promotion of Hungarian businesses through trading houses," the promotion of Hungary as a destination for United States tourists, "[t]he promotion of American investment in Hungarian business[,]" "[t]he acquisition by Hungary of military equipment," Hungary's use of the United States' capital and debt markets to secure financing, and Hungary's acceptance of federal grants and loans from the United States. Second Am. Compl. ¶ 101.

The district court again dismissed the case. The court chose not to address whether the Survivors had adequately pled facts supporting application of the FSIA's expropriation exception. Instead, the district court held that, notwithstanding the jurisdiction expressly granted by the FSIA over properly pled expropriation claims, "principles of international comity" required the Survivors "to exhaust [Hungarian] remedies, except where those remedies are futile or imaginary." *Simon v. Republic of Hungary*, 277 F. Supp. 3d 42, 54 (D.D.C. 2017) (internal quotation marks omitted) (citing *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847,

852, 858 (7th Cir. 2015)). The district court further ruled that, notwithstanding the Survivors' arguments about the rise of anti-Semitism in Hungary, a "lack of meaningful remedies," and restrictions on the independence of Hungary's judiciary, the Survivors' "pursuit of their claims in Hungary would not be futile." *Simon*, 277 F. Supp. 3d at 57–63.

The district court further decided that dismissal was warranted under the doctrine of *forum non conveniens*. The court reasoned that the Survivors' choice of forum merited "minimal" deference, and that Hungary would be more convenient because of the evidence and many witnesses located there. *Simon*, 277 F. Supp. 3d at 63, 64–65. In applying the *forum non conveniens* doctrine, the court placed particular emphasis on Hungary's interest in resolving the dispute itself. *Id*. at 66.

The Survivors appeal both grounds for dismissal and request that the case be reassigned to a new district court judge. We agree that the district court erred in requiring the exhaustion of Hungarian remedies and in its *forum non conveniens* analysis, but see no basis for assigning a new district court judge to hear the case.

**II**

Because this appeal arises from a dismissal at the threshold of the case, "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor." *Philipp*, 894 F.3d at 409 (internal quotation marks omitted). "[T]he court may [also] consider the complaint supplemented by undisputed facts" of record. *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). We review *de novo* the statutory question of whether the FSIA allows a federal court,

on grounds of international comity, to dismiss a case over which it has jurisdiction (at a minimum as to MÁV) in favor of the defendant's home forum. *Philipp*, 894 F.3d at 410. A district court's *forum non conveniens* determination is reviewed for a clear abuse of discretion. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008).

**III**

**A**

Hungary and MÁV (collectively, "Hungary") argue first that, even if the FSIA provides jurisdiction, the Survivors were required as a matter of international comity to first "exhaust" or "prudential[ly] exhaust[]" their claims in the Hungarian courts. Hungary Br. 34. According to Hungary, FSIA jurisdiction would attach, if at all, only if Hungary closed its doors to their claims or the Survivors "show[ed] that exhaustion would be futile." *Id*. at 28.

Before addressing that argument, some clarification of language is in order. Exhaustion involves pressing claims through a decisional forum—often an administrative agency or specialized body—whose decision is then subject to the review of a federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90, 92 (2006) (describing exhaustion as requiring a plaintiff to "us[e] all steps that the agency holds out, and do[] so *properly* (so that the agency addresses the issues on the merits)," or "requir[ing] a state prisoner to exhaust state remedies before filing a habeas petition in federal court") (internal quotation marks omitted). When exhaustion applies, parties retain the legal right to direct judicial review of the underlying decision.

The doctrine that Hungary invokes omits a crucial element of traditional "exhaustion"—the Survivors' right to subsequent judicial review here of the Hungarian forum's decision. Indeed, while we need not definitively resolve the question, there is a substantial risk that the Survivors' exhaustion of any Hungarian remedy could preclude them by operation of *res judicata* from ever bringing their claims in the United States. *See* Professor William S. Dodge Amicus Br. 15; *de Csepel v. Republic of Hungary*, 714 F.3d 591, 606–608 (D.C. Cir. 2013).

So understood, enforcing what Hungary calls "prudential exhaustion" would in actuality amount to a judicial grant of immunity from jurisdiction in United States courts. But the FSIA admits of no such bar. As this court recently held in *Philipp v. Federal Republic of Germany*, *supra*, nothing in the FSIA or federal law empowers the courts to grant a foreign sovereign an immunity from suit that Congress, in the FSIA, has withheld. 894 F.3d at 414–415. To the contrary, the whole point of the FSIA was to "abate[] the bedlam" of case-by-case immunity decisions, and put in its place a "'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *Id.* at 415 (additional internal quotation marks and citation omitted) (quoting *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014)). There is no room in those "comprehensive" standards governing "every civil action," *id.*, for the extra-textual, case-by-case judicial reinstatement of immunity that Congress expressly withdrew. As we explained in *Philipp*—echoing the Supreme Court—the whole point of the FSIA is that, "[g]oing forward, 'any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall.'" *Id.* at 415 (quoting *NML Capital*, 134 S. Ct. at 2256).

14

Turning then to statutory text, Hungary's exhaustion-cum-immunity argument has no anchor in the FSIA. In fact, as *Philipp* explains, the text points against it. When Congress wanted to require the pursuit of foreign remedies as a predicate to FSIA jurisdiction, it said so explicitly. *Philipp*, 894 F.3d at 415 (citing 28 U.S.C. § 1605A(a)(2)(A)(iii)); *see also* Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note § 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."). More to the point, the FSIA is explicit that, if a statutory exception to immunity applies—as we have squarely held it does at least as to MÁV, *Simon*, 812 F.3d at 147—"[a] foreign state *shall not be immune* from the jurisdiction of courts of the United States or of the States." 28 U.S.C. § 1605(a) (emphasis added). Courts cannot end run that congressional command by just relabeling an immunity claim as "prudential exhaustion."

Nor is Hungary's form of judicially granted immunity among those historical legal doctrines, like *forum non conveniens*, that Congress chose to preserve when it enacted the FSIA. *Philipp*, 894 F.3d at 416 (citing 28 U.S.C. § 1606). *Forum non conveniens* predates the FSIA by centuries, and it was an embedded principle of the common-law jurisprudential backdrop against which the FSIA was written. *Altmann*, 541 U.S. at 713 (Breyer, J., concurring); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248 n.13 (1981) (tracing the history of the doctrine). Hungary's theory, by contrast, lacks any pedigree in domestic or international common law. *See Philipp*, 894 F.3d at 416 (citing *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 466 F. Supp. 2d 6, 21 (D.D.C. 2006) ("[T]his court is not willing to make new law by relying on a misapplied, non-binding international legal concept.")).

In short, controlling circuit and Supreme Court precedent give no quarter to Hungary's theory of judicial immunity wrapped in exhaustion clothing. Under the FSIA, courts are duty-bound to enforce the standards outlined in the statute's text, and when jurisdiction exists (as it does at least over MÁV), courts "have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).

**B**

Unlike Hungary's prudential immunity/exhaustion theory, the ancient doctrine of *forum non conveniens* is not displaced by the FSIA. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490 n.15 (1983); *see also Altmann*, 541 U.S. at 713 (Breyer, J., concurring). The doctrine applies when both the United States and a foreign forum could exercise jurisdiction over a case, but the United States proves to be "an inconvenient forum," or the plaintiff is "'vex[ing],' 'harass[ing],' or 'oppress[ing]' the defendant by inflicting upon him expense or trouble not necessary" to the plaintiff's pursuit of a remedy. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

The *forum non conveniens* doctrine comes with ground rules. The starting point is "a strong presumption in favor" of the plaintiff's choice of the forum in which to press her suit. *Piper*, 454 U.S. at 255–256; *see also Atlantic Marine Const. Co. v. United States Dist. Court for the W. Dist. of Texas*, 571 U.S. 49, 66 n.8 (2013) (plaintiffs' chosen forum is hard to overcome "because of the 'harsh result' of [the *forum non conveniens*] doctrine," which "requires dismissal of the case * * * and inconveniences plaintiffs in several respects and even makes it possible for plaintiffs to lose out completely")

(internal quotation marks and alternations omitted). The plaintiff's choice of forum merits still "greater deference when the plaintiff has chosen [her] home forum." *Piper*, 454 U.S. at 255. For it is reasonable to assume that "this choice is convenient," and convenience is the lodestar of the *forum non conveniens* doctrine. *Id.* at 256. By the same token, a foreign plaintiff's choice to litigate in the United States "deserves less deference." *Id.*

Because Hungary seeks to strip the Survivors of their chosen forum and to force them to sue on Hungary's home turf, Hungary bears the burden of showing both that an "adequate alternative forum for the dispute" exists, *Chabad*, 528 F.3d at 950, and that it is "the *strongly preferred* location for the litigation," *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010) (emphasis added). The court must likewise "ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice." *Nemariam v. Federal Democratic Republic of Ethiopia*, 315 F.3d 390, 392–393 (D.C. Cir. 2003) (citation omitted).

In deciding whether to deny a plaintiff her chosen forum, courts weigh a number of private and public interests. *Piper*, 454 U.S. at 241. At bottom, the "strong presumption in favor of the plaintiff's choice" can be "overcome only when the private and public interest factors *clearly* point" to a foreign forum. *Id.* at 255 (emphasis added).

The district court committed a number of legal errors that so materially distorted its analysis as to amount to a clear abuse of discretion. *See El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996) ("[T]he district court abuses its discretion when it fails to consider a material factor or clearly errs in evaluating the factors before it, or does not hold the

defendants to their burden of persuasion on all elements of the *forum non conveniens* analysis.") (formatting edited), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 314–315 (2010); *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.") (internal quotation marks omitted).

**1**

The district court committed legal error at the first step by affording the Survivors' choice of forum only "minimal deference." *Simon*, 277 F. Supp. 3d at 63. The starting point is that the Survivors' choice of forum controls, and "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should *rarely* be disturbed." *Gulf Oil*, 330 U.S. at 508 (emphases added). So it is Hungary that "bears a heavy burden in opposing [the Survivors'] chosen forum." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). Deference to the plaintiffs' choice is magnified when, as here, United States citizens have chosen their home forum. *See Piper*, 454 U.S. at 255.

The district court set the scales wrong from the outset. It held that only "minimal deference" was due in this case because, although four of the plaintiffs were United States citizens, the other plaintiffs—from Canada (2), Israel (7), and Australia (1)—"will be required to travel internationally regardless of whether the litigation is in the United States or

Hungary." *Simon*, 277 F. Supp. 3d at 63. That analysis misstepped in three respects.

First, the addition of foreign plaintiffs does not render for naught the weighty interest of Americans seeking justice in their own courts. Here, nearly a third of the plaintiffs are from the United States. And there is no claim or evidence that the United States plaintiffs are in the case only as jurisdictional makeweights seeking to manipulate the forum choice. Under these circumstances, the United States' plaintiffs' preference for their home forum continues to carry important weight in the *forum non conveniens* analysis.

Second, the fact that other plaintiffs must travel does nothing to show that it is more convenient for *all* plaintiffs to travel to Hungary rather than for *some* to travel to the United States. The presence of foreign plaintiffs certainly does not justify the preference for a forum—Hungary—in which *no* plaintiff resides. The question, after all, centers on convenience, and forcing every single one of the many elderly plaintiffs to travel internationally is in no way convenient. *See Piper*, 454 U.S. at 256 n.24 ("[C]itizenship and residence are proxies for convenience[.]") (citation omitted); *cf. Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) ("[T]he degree of deference given to a plaintiff's forum choice varies with the circumstances."). Nor is it in any way convenient for every one of the Survivors to return to the country that committed the mass murder of their families and the genocidal theft of their every belonging.

Hungary bears the heavy burden of persuasion here. Yet it made no effort to show how—as a matter of geographic proximity, available transportation options, cost of travel, ease of travel access, or any other relevant consideration—the United States is a less convenient forum than Hungary for the

United States and Canadian plaintiffs, or even for the Israeli and Australian plaintiffs, to access and conduct their litigation. To be sure, Hungary need not have engaged in "extensive investigation" to demonstrate that it is the more convenient forum. *Piper*, 454 U.S. at 258. But given its burden of proof, Hungary had to do something to show that its home turf was the more convenient location for the *litigation*, and not just more convenient for the *defendant*. *See id*. at 256 ("[T]he central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient[.]").

Third, it is indisputably inconvenient to further delay the elderly Survivors' almost decade-long pursuit of justice. *See Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 396, 399 n.5 (D.C. Cir. 2018) (plaintiff waited "nineteen years" for a decision on her restitution application from a foreign nation). That is important because, if a remedy ultimately proves unavailable in Hungary, there is an open question whether that lost time might render the Survivors ineligible for FSIA jurisdiction were they to once again attempt to press their claims here. *See id*. at 399 n.5 (noting, without resolving, the question of whether the foreign nation's or instrumentality's commercial activity must be "contemporaneous to the filing of suit in th[e] [United States], rather than contemporaneous with the alleged expropriation"). District courts must ensure that a decision to dismiss on *forum non conveniens* grounds will not lead to a foreign sovereign "delaying exhaustion of a plaintiff's remedies under its own laws" in a way that could end up foreclosing the claims altogether. *Id.*

In supplemental briefing before this court, Hungary raises, for the first time in this litigation, an argument that the Survivors seek to represent a class with more Hungarian members than American members. That is too little too late. For starters, that factual argument is forfeited because it has

been fully available to Hungary from the onset of this litigation, yet it was not presented to the district court. *See Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009).

In any event, the argument does not hold water. No class has been certified in this case. Hungary's argument rests instead on information derived from a different case in the Southern District of Florida, *see* Settlement Agreement, *Rosner v. United States*, No. 01-01859 (S.D. Fla. April 29, 2005), ECF No. 209. Yet Hungary offers no evidence that the two groups of plaintiffs would be the same or would have significant overlap. Unadorned and tardy speculation carries no weight in the *forum non conveniens* calculus.

In sum, the misplacement of the burden of proof and the resulting material gaps in the district court's legal analysis of Hungary's arguments in favor of a Hungarian forum pull the legs out from under much of the district court's *forum non conveniens* analysis.

**2**

The district court misallocated the burden of proof in a second consequential respect. The court tasked the Survivors with proving that Hungary was not a proper forum. Specifically, the district court ruled that its prior finding, for purposes of "prudential exhaustion," that the Survivors' "pursuit of their claims in Hungary would not be futile" equally "satisfie[d]" the requirement "that Hungary [be] both an available and adequate alternative forum." *Simon*, 277 F. Supp. 3d at 63. More specifically, the court earlier found that the Survivors failed to "show convincingly" that Hungarian remedies are "clearly a sham or inadequate or that their application is unreasonably prolonged" in a manner that would render Hungarian remedies "futile." *Id*. at 54 (internal

quotation marks omitted). In so ruling, the court noted the Survivors' "heavy burden" to come forward with a "legally compelling reason" why resort to a Hungarian forum would be futile. *Id.* at 57 (internal quotation marks omitted). The court also considered and rejected piece by piece the Survivors' evidence of futility, ultimately deeming their arguments against so-called prudential exhaustion "[un]persuasive." *Id.* at 59–62.

That chain of reasoning does not carry over to the *forum non conveniens* doctrine, where the job of proving the availability and adequacy of a Hungarian forum was Hungary's, not the Survivors'. *See Chabad*, 528 F.3d at 950. On top of that, the question is not whether the alternative forum is a sham, inadequate, or unreasonably slow. Hungary had to affirmatively prove both that an adequate remedy exists and that the comparative convenience of its home forum was so "strong[]" as to clearly warrant displacing the Survivors' chosen forum. *Gulf Oil*, 330 U.S. at 508.

Hungary dismisses the court's error as an "innocuous" statement, Hungary Br. 15, pointing to the court's later reference to the correct standard in a parenthetical, *id.* (quoting *Simon*, 277 F. Supp. 3d at 62); *see also* Dissenting Op. at 5 (characterizing the misallocation of the burden of proof as "at worst, an obviously harmless error"). But applying the correct burden of proof is not a box-checking exercise. What matters is whether the court's analysis fit those later words. It did not. The district court instead equated its earlier finding of non-futility with proof that "Hungary is both an available and adequate alternative forum." *Simon*, 277 F. Supp. 3d at 63. Those are two very different inquiries. *See Fischer*, 777 F.3d at 867 ("To be sure, the burden of proof differs between the [prudential exhaustion and *forum non conveniens*] inquiries" because, in the latter inquiry, defendants must

"establish that the remedies are adequate.") (emphasis omitted).

The proof is in the pudding. Under its inverted analysis, the district court never analyzed the critical question of the availability and adequacy of the Hungarian forum. Bypassing that question was anything but harmless in this case, where even the United States government lacks "a working understanding of the mechanisms that have been or continue to be available in Hungary with respect to such claims." Brief for *Amicus Curiae* the United States at 11. It is hard to understand how a foreign forum can be so clearly more convenient when the United States government itself does not have a clear understanding of its nature or operation.[3]

In other words, the district court let Hungary off the burden-of-proof hook by transforming the Survivors' failure to prove futility in the "prudential exhaustion" inquiry into proof of Hungary's clear superiority as a forum in the *forum non conveniens* analysis. On this record, that was a consequential legal error. *See El-Fadl*, 75 F.3d at 677 ("[T]he district court abuses its discretion when it * * * does not hold the defendants to their burden of persuasion on all elements of the *forum non conveniens* analysis.") (emphasis added and internal quotation marks omitted).

**3**

The consequences of the district court's burden-allocation errors snowballed as the court balanced the competing private and public interests in the two fora. The ultimate inquiry, again, puts the onus on Hungary. The law's "strong

---

[3] To be fair to the district court, it did not have the benefit of this brief from the United States at the time of its decision.

presumption in favor of the plaintiff's choice of forum," *Piper*, 454 U.S. at 255, can be overridden only if the "private and public interest factors *strongly* favor[] dismissal," *Chabad*, 528 F.3d at 950 (emphasis added). Given the record in this case, the district court's failure to hold Hungary to that task makes this among "the rare case[s]" in which a district court's balancing of factors amounts to an abuse of discretion. *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018).

**a**

As relevant here, the private-interest factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling [witnesses;] * * * and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Piper*, 454 U.S. at 241 n.6 (internal quotation marks omitted). It is the defendants' obligation to "provide enough information to enable the District Court to balance" the factors. *Piper*, 454 U.S. at 258. The court's analysis of the relevant record material in this case was too quick to credit Hungary's claims and too slow to value the Survivors' evidence.

In weighing the private-interest factors, the district court reasoned that (i) extensive records are located in Hungary that would require translation into English, (ii) "many witnesses with personal knowledge will be located in Hungary" and unable to travel, and (iii) the Survivors might later choose to bring an action against Rail Cargo Hungaria Zrt., a previously dismissed defendant. *Simon*, 277 F. Supp. 3d at 64–65. None of those reasons stands up to scrutiny.

At best, the location-of-relevant-evidence factor is in equipoise. While there are some records in Hungary, the Survivors showed that an extensive collection of relevant

records has been amassed by the United States Holocaust Memorial Museum in Washington, D.C.  *See* Memorandum in Opposition to Hungary's Motion to Dismiss 21, *Simon v. Republic of Hungary*, No. 10-1770 (D.D.C. Oct. 31, 2016), ECF No. 122.[4]

The issue of translation points both ways as well.  Given that many of the Survivors speak English, the documents will in all likelihood have to be translated and "digitized" for the parties regardless of which forum hears the case.  *See Philipp v. Federal Republic of Germany*, 248 F. Supp. 3d 59, 85 (D.D.C. 2017), *aff'd*, 894 F.3d 406 (D.C. Cir. 2018). Digitization, moreover, has eased the burden of transcontinental document production and has increasingly become the norm in global litigation.  *See, e.g.*, *id.* at 85; *Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 44 (D. Conn. 1996).

The district court placed heavy emphasis on the presence of "many witnesses" in Hungary who cannot or were unwilling to travel.  *Simon*, 277 F. Supp. 3d at 65.  But that finding resulted from failing to hold Hungary to its burden of proof. Hungary failed to identify a single witness in Hungary that would need to testify at trial.  In actuality, the evidence in this case will be largely documentary.  *See* Oral Argument Tr. 4:17–4:21 ("[Survivors' Attorney]:  No, I don't believe any people from Hungary will be called to prove our case. * * * [I]t'll also be proven by reference to some documents[.]"); *id.*

---

[4] The Dissenting Opinion faults the Survivors for not having yet—at this pre-discovery stage—locked down the specific location of documents regarding their "individual cases" of seizure and expropriation.  Dissenting Op. at 7.  But the Dissenting Opinion offers no justification for visiting upon the Survivors the very duty of "extensive investigation" that it rejects for Hungary at this procedural stage.  *Compare* Dissenting Op. at 7, *with* Dissenting Op. at 3.

25

at 19:1–19:4 (defendants' listing "bank records," "business records," and "tax records" as the type of evidence the court would evaluate). That makes sense. Because the relevant events occurred more than seventy years ago, the likelihood is low that "many witnesses with personal knowledge" still exist and are able to testify. *Simon*, 277 F. Supp. 3d at 65 (internal quotation marks omitted). Someone who was barely an adult during the war would now be in their mid-90s. To be sure, the Survivors wished to depose *one* elderly witness in Hungary. But that is far too little to tip the balance at all, let alone strongly, in Hungary's favor. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 426–429 (2006) (when evidence is "in equipoise," the burden of proof has not been met).

The district court also emphasized that the Survivors might wish to join Rail Cargo Hungaria Zrt. as a defendant. But the ability to implead third-party defendants becomes relevant when the missing defendant is "crucial to the presentation of [the appellee's] defense." *Piper*, 454 U.S. at 259 (explaining that the ability to implead another defendant was significant because the other parties could be relieved of liability). Neither Hungary nor MÁV has argued that Rail Cargo Hungaria Zrt. is crucial to its defense. And the Survivors do not claim that Rail Cargo Hungaria Zrt. is necessary to the presentation of their case. In the absence of a more substantial showing of relevance or necessity, the district court erred in relying on speculation about the Survivors' possible future litigation strategy as a ground for overriding their chosen forum.

**b**

As relevant to this case, the public-interest factors include:

> [T]he administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [and] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law[.]

*Piper*, 454 U.S. at 241 n.6 (quoting *Gulf Oil*, 330 U.S. at 509). The district court concluded that those factors weighed in favor of a Hungarian forum because of Hungary's "stronger" moral interest in resolving the dispute, the likelihood that Hungarian law would apply to the Survivors' claims, and the administrative burden the litigation could impose on the court. *Simon*, 277 F. Supp. 3d at 66–67. That analysis failed to hold Hungary to its burden of proof, misanalyzed the record evidence, and overlooked material omissions in Hungary's claims.

First, the district court erred in assigning such significant weight to Hungary's asserted interest in addressing the Survivors' claims. *See Simon*, 277 F. Supp. 3d at 66. Hungary has had over seventy years to vindicate its interests in addressing its role in the Holocaust. Yet the scheme Hungary currently has in place has not been recognized by the United States government. *See* United States Statement of Interest at 1 (expressing "the United States' strong support for international agreements with Austria involving Holocaust claims against Austrian companies," without mentioning any of Hungary's laws to compensate victims); United States Br. 11 (United States does not "have a working understanding of the mechanisms that have been or continue to be available in Hungary with respect to such claims").

Beyond that, the district court erred in putting Hungary's and the four American citizens' and other Survivors' interests at cross-purposes. Allowing these claims to go forward and the evidence to be shown in a United States court will in no way impair Hungary's ability to use that same evidence to provide reparations and remediation to the Survivors of its own accord.

The district court relied on *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 866 (2008), for the proposition that United States courts should respect a foreign sovereign's interest in addressing its own past wrongs. *Simon*, 277 F. Supp. 3d at 66. That mixes apples and oranges. At issue in *Pimentel* was whether a suit that involved the Republic's assets and in which the FSIA did *not* authorize jurisdiction could still proceed *without* including the Republic as a party. *Pimentel*, 553 U.S. at 865. More specifically, the case focused on whether, under Federal Rule of Civil Procedure 19(b), the Republic was an indispensable party whose absence would bar the lawsuit from going forward. *Id.* at 862. All parties agreed that the Republic was a necessary party, but they disagreed over whether the Rule 19(b) factors permitted the action to proceed without it. *Id.* at 863–864.

The Supreme Court held that, when considering the intersection of joinder rules and sovereign immunity, "[a] case may not proceed when a required-entity sovereign is not amenable to suit." 533 U.S. at 867. To hold otherwise, the Court added, would fail to "giv[e] full effect to sovereign immunity" and would offend the very interests that gave rise to the foreign sovereign immunity doctrine and the FSIA in the first place. *Id.* at 866. *Pimentel*, in other words, enforces the immunity lines that the FSIA draws.

That bears no resemblance to this case. This case does not involve necessary-party status under Rule 19; Hungary and MÁV are already parties; and the FSIA's expropriation exception grants jurisdiction over at least one (and perhaps both) of the Hungarian defendants. *See Simon*, 812 F.3d at 147; 28 U.S.C. § 1605(a)(3). It also bears noting that the already certified class in *Pimentel* consisted primarily of Philippine nationals, including "[a]ll *current* civilian citizens of the Republic of the Philippines." *Hilao v. Estate of Marcos*, 103 F.3d 767, 774 (9th Cir. 1996) (emphasis added). By contrast, not one of the named Survivors in this case resides in or is a citizen of Hungary, and Hungary submitted no evidence to the district court identifying a single potential Hungarian class member or even a Hungarian witness.

Hungary additionally argues that other cases have acknowledged a foreign sovereign's interest in resolving disputes internally. But the cases that Hungary cites involved questions of personal jurisdiction and the extraterritorial application of the Alien Tort Statute, 28 U.S.C. § 1350. *See* Hungary Supp. Br. 8–9 (citing *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108 (2013), and *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). Those cases do not speak to whether a court should, on *forum non conveniens* grounds, refuse to exercise jurisdiction that does exist. Nor do they implicate the heavy burden a defendant carries in overcoming a plaintiff's choice of forum.

The district court's second legal error was brushing off the United States' own interests in the litigation. The district court concluded that the Survivors' claims have no connection to the United States. *Simon*, 277 F. Supp. 3d at 66. That is not correct. For starters, there are four United States citizen plaintiffs in the suit. The United States has an obvious interest in supporting their efforts to obtain justice in a timely

manner and, to that end, in ensuring that a United States forum is open to those whose claims fall within the courts' lawful jurisdiction.

Beyond that, the United States government has announced that it has a "moral imperative * * * to provide some measure of justice to the victims of the Holocaust, and to do so in their remaining lifetimes." United States Br. at 9–10. That interest is part of a larger United States policy to support compensation for Holocaust victims, especially its own citizens. "The policy of the United States Government with regard to claims for restitution or compensation by Holocaust survivors and other victims of the Nazi era has consistently been motivated by the twin concerns of justice and urgency." United States Statement of Interest at 2. For the four citizen plaintiffs in this case, that interest is so compelling that Congress enacted it into law. *See* Justice for Uncompensated Survivors Today Act of 2017, Pub. L. No. 115-171, 132 Stat. 1288, 1289 (2018) (requiring the Secretary of State to compile a report that evaluates other countries' "progress toward the resolution of claims for United States citizen Holocaust survivors and United States citizen family members of Holocaust victims").

The United States has also been actively involved in obtaining justice for Nazi-era victims with countries that have shown themselves willing to provide such redress. *See* United States Statement of Interest at 2, 4–5 (The United States has "assist[ed] in several international settlements which have provided approximately $8 billion dollars for the benefit of victims of the Holocaust"; signed Executive Agreements with countries that had collaborated with the Nazis; and "committed to take certain steps to assist Austria and Austrian companies in achieving 'legal peace' in the United States with respect to Nazi-era forced and slave labor claims[.]"). The United

States' strong and longstanding interest in ensuring the *timely* remediation of the claims of Holocaust survivors, especially for its own citizens, carries important weight in the *forum non conveniens* analysis.

Third, Hungary failed to show that the choice-of-law factor favors its forum. The district court reasoned that "Hungarian law would likely apply to the plaintiffs' claims," making a Hungarian forum a better fit. *Simon*, 277 F. Supp. 3d at 66. But neither party argues that current Hungarian law should apply. The Survivors assert that international common law governs their claims. Survivors' Reply Br. 25. If so, United States courts are every bit as adept at applying that law as a Hungarian forum would be.

Hungary argues that historical Hungarian law from the time the property was seized should govern the claims. Oral Argument Tr. 21:22–21:23. That cannot be right. Hungarian law at that time made the genocidal seizures lawful and deprived Jews of all legal rights and status. *See id.* 22:6– 22:9. That is the same law that authorized the deportation of Hungarian Jews to death camps. Consigning the Survivors to that legal regime would be the plainest of errors.

Finally, the United States has advised this court that it has no specific foreign policy or international comity concerns that warrant dismissal of this case in favor of a Hungarian (or any other) forum. United States Br. at 11 ("[T]he United States does not express a view as to whether it would be in the foreign policy interests of the United States for plaintiffs to have sought or now seek compensation in Hungary."). Quite the opposite, the United States' brief here emphasized its governmental interest in the timely resolution of the Survivors' claims during their lifetimes. *Id*. at 9–11. Likewise, its statement of interest filed in the district court gave no reason why this case

should be dismissed and sent to Hungary. *See generally* United States Statement of Interest. That silence speaks volumes when contrasted with the federal government's first unprompted Statement of Interest in this case in which it strongly recommended that the third defendant, a privately owned Austrian company, be dismissed because of Austria's ongoing, collaborative efforts to provide reparations to victims of the Holocaust. *See id.* at 1. That defendant has since been dismissed from the case. *Simon*, 277 F. Supp. 3d at 47 n.1.

At bottom, the relevant private and public interests in this case, strengthened by the United States government's views, point strongly in favor of the Survivors' forum choice. They certainly do not tilt decisively in favor of the Hungarian forum. While we accord respectful deference to district courts' *forum non conveniens* determinations, we do not rubber stamp them. Our task is to ensure that district courts' decisions hew to the burdens of proof and enforce the applicable legal presumptions. In this case and on this record, the nature and importance of the district court's legal and analytical errors render its judgment that Hungary met its weighty burden of proof a clear abuse of discretion.

## C

Lastly, the Survivors request that their case be assigned to a different district court judge. "[W]e will reassign a case only in the exceedingly rare circumstance that a district judge's conduct is 'so extreme as to display clear inability to render fair judgment.'" *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 763 (D.C. Cir. 2014) (citation omitted); *see also Cobell v. Kempthorne*, 455 F.3d 317, 331 (D.C. Cir. 2006) ("[W]e exercise this authority only in extraordinary cases."). That standard has not remotely been met here. There is no evidence that the district court judge acted with anything but

impartiality in this case, and "we have no reason to doubt that the District Court will render fair judgment in further proceedings." *In re Kellogg*, 756 F.3d at 763–764.

\* \* \* \* \*

Winston Churchill described the brutal genocidal expropriations, deportations, and mass extermination of Hungarian Jews at Nazi death camps as "'probably the greatest and most horrible crime ever committed in the history of the world.'" *Simon*, 812 F.3d at 132. The district court erred in declining to exercise statutorily conferred jurisdiction over the Survivors' effort to obtain some measure of reparation for those injuries both by wrongly requiring them to adjudicate their claims in Hungary first, and by misapplying the law governing the *forum non conveniens* analysis. We deny the Survivors' request that the case be reassigned, and remand for further proceedings consistent with this opinion.

*So ordered.*

KATSAS, *Circuit Judge*, dissenting: The district court concluded that this foreign-cubed case—involving wrongs committed by Hungarians against Hungarians in Hungary—should be litigated in Hungary. In so doing, the court permissibly applied the settled law of *forum non conveniens*.

Our standard of review is narrow. As the Supreme Court has instructed: "The *forum non conveniens* determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981). Thus, a reviewing court may not "substitute[ ] its own judgment for that of the District Court." *Id.* Under this narrow standard, reversal here is unwarranted.

The district court correctly stated the relevant legal principles. First, it acknowledged "the 'substantial presumption in favor of a plaintiff's choice of forum.'" *Simon v. Republic of Hungary* (*Simon III*), 277 F. Supp. 3d 42, 62 (D.D.C. 2017) (quoting *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008)). Then, the court correctly stated the governing rule—"a court 'may nonetheless dismiss a suit for *forum non conveniens* if the defendant shows (1) there is an alternative forum that is both available and adequate and, (2) upon a weighing of public and private interests,' that the alternative forum is 'the strongly preferred location for the litigation.'" *Id.* (alterations adopted) (quoting *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010)). Finally, the court correctly identified nine relevant private- and public-interest factors to be considered. *Id.*

My colleagues conclude that the district court gave insufficient weight to the plaintiffs' choice of forum, relieved

2

the defendants of their burden of proof, and unreasonably balanced the relevant factors.  Respectfully, I disagree.

A

The district court permissibly assessed the weight owed to the plaintiffs' choice of a United States forum.  At the outset, the court repeatedly recognized the "substantial presumption" or "substantial deference" generally due to such a choice.  277 F. Supp. 3d at 62, 63.  Then, the court reasoned that the degree of deference was "lessened" in this case because only four of the fourteen named plaintiffs are United States residents, because "none of the underlying facts in this case relate to the United States in any way," and because the named plaintiffs and the putative class that they seek to represent come "from all over the globe," whereas the defendants are based entirely in Hungary.  *Id.* at 63.

This analysis is consistent with governing law.  As the Supreme Court has explained:  "When the home forum has been chosen, it is reasonable to assume that this choice is convenient," but "[w]hen the plaintiff is foreign, ... this assumption is much less reasonable."  *Piper Aircraft*, 454 U.S. at 255–56.  And, in either case, the plaintiffs' choice is significant only insofar as it bears on "the central purpose of any *forum non conveniens* inquiry," namely "to ensure that the trial is convenient."  *Id.* at 256.  Thus, the district court was amply justified in considering the residencies of all parties as well as the disconnect between the plaintiffs' chosen forum and the relevant facts—matters that bear directly on the convenience of litigating this case in a United States court.

My colleagues highlight the district court's single usage of the phrase "minimal deference," which they read as a threshold legal error of "set[ting] the scales wrong from the outset."  *Ante*

at 11, 17. What the court actually said, *after* flagging the various considerations noted above, was that "[i]n these circumstances, the plaintiffs' choice of forum is entitled to minimal deference." 277 F. Supp. 3d at 63. In context, the statement reflects not a failure to recognize the presumption, but the court's considered conclusion that the "defendants had overcome the presumption" in this case. *Id.* at 64 (quoting *Moscovits v. Magyar Cukor Rt.*, 34 F. App'x 24, 26 (2d Cir. 2002)). That was neither legal error nor an abuse of discretion. *See*, *e.g.*, *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc) ("the degree of deference given to a plaintiff's forum choice varies with the circumstances").

My colleagues object that Hungary made no detailed presentation regarding the plaintiffs' travel options. *Ante* at 18–19. But the Supreme Court has warned that "[r]equiring extensive investigation would defeat the purpose" of the *forum non conveniens* motion. *Piper Aircraft*, 454 U.S. at 258. The defendants were not required to conduct travel surveys to make the commonsense point that less deference is due to the plaintiffs' choice when most plaintiffs would need to travel internationally regardless of the forum. Nor was evidence necessary to establish that all of the defendants are based, and all of the relevant facts arose, in Hungary. On its face, the complaint makes that clear. *See* J.A. 104–23.

My colleagues also fault the district court for failing to consider whether any litigation delays in Hungary might prevent the plaintiffs from later re-filing in the United States. *Ante* at 19. But the plaintiffs did not raise this argument either below or in their opening brief, so it is twice forfeited. *See*, *e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). Nor did the plaintiffs ask the district court, as a fallback remedy, to attach conditions to any dismissal. And in any event, the whole point of *forum non conveniens* law is to

dismiss cases that can more conveniently be adjudicated elsewhere, not to defer adjudications while plaintiffs exhaust claims or remedies in other fora.

B

My colleagues next contend that the district court improperly required the plaintiffs to prove that Hungary was not an available and adequate forum for their claims, rather than requiring the defendants to prove that it was. *Ante* at 20. But, in laying out the "applicable legal principles" of *forum non conveniens*, the district court explicitly stated that dismissal is appropriate only if "the defendant shows" that "there is an alternative forum that is both available and adequate." 277 F. Supp. 3d at 62. The court did not improperly shift that burden.

My colleagues note that the district court, in addressing whether Hungary was an adequate alternative forum, rested on its conclusion that pursuing claims in Hungary would not be futile for purposes of exhaustion. In the court's own words, "the finding that the plaintiffs' pursuit of their claims in Hungary would not be futile satisfies the first prong of the test for application of the *forum non conveniens* doctrine that Hungary is both an available and adequate alternative forum." 277 F. Supp. 3d at 63.

The district court's statement made good sense in the context of its overall analysis. After all, in setting forth the governing principles on futility, the district court exclusively invoked the adequacy standards of *forum non conveniens* law. *See* 277 F. Supp. 3d at 57–58. My colleagues correctly note that exhaustion and *forum non conveniens* law assign the opposite burden of proof on the question of futility or adequacy. *Ante* at 21–22. But here, both sides presented detailed affidavits regarding Hungarian law and practice, so the

burden of production did not matter. Likewise, the district court assessed futility as a matter of law, based on undisputed assertions in both affidavits, so the burden of persuasion did not matter. Nor did the district court even conclude that the competing legal arguments were at or near the point of equipoise. In context, the district court's cross-reference to its analysis of futility was an appropriate shorthand or, at worst, an obviously harmless error.

The court's analysis makes all of this clear. Among other things, the court explained that the Hungarian constitution "requires that parties be treated fairly and equally in court, prohibits discrimination on the basis of, among other things, race or religion, and creates rights of appeal to various appellate courts." 277 F. Supp. 3d at 58. The court noted that Hungary recognizes and enforces international law and provides damages for the types of property losses alleged here. *Id.* And it stated that these and other considerations, as set forth by the defendants and their experts, "strongly support the conclusion that Hungary is an adequate alternative forum for the plaintiffs' claims." *Id.* The court then considered a "variety" of the plaintiffs' competing arguments and concluded that "[n]one is persuasive." *Id.* at 59–62. Apart from their mistaken argument about a misplaced burden of proof, neither the plaintiffs nor my colleagues challenge any relevant particulars of this analysis.

My colleagues note that the United States declined to take a position on the availability and adequacy of a Hungarian forum. *Ante* at 22. But the government's failure to address that question hardly suggests that the district court, in assessing the detailed submissions made to it on that very point, committed legal error or otherwise abused its discretion.

6

C

The district court reasonably balanced the private and public interests involved. On these points, my colleagues do not argue that the district court committed any discrete legal error, but only that the court abused its discretion in weighing the relevant factors.

1

With regard to private interests, the district court reasonably concluded that much of the evidence in this case will involve paper records written in Hungarian and located in Hungary. The court cited declarations noting "the extensive documents in the Hungarian Archives related to property taken from Hungarian nationals during World War II." 277 F. Supp. 3d at 64. The court also cited the plaintiffs' own complaint, which repeatedly references "vital" evidence "kept by the defendants in Hungary." *Id.* And the court cited declarations attesting that any pertinent documents were likely written in Hungarian, which would require translation into English if this case were heard in the United States. *Id.* at 64–65.

My colleagues conclude that, "[a]t best, the location-of-relevant-evidence factor is in equipoise," because "some" records are in Hungary, while an "extensive" collection is at the Holocaust Museum in Washington. *Ante* at 23–24. But the defendants' evidence showed that the Hungarian National Archives "have a substantial amount of documentation" regarding the Hungarian Holocaust, J.A. 184, and the plaintiffs' own legal expert confirmed "an abundance of records of these confiscations in Hungarian archives," J.A. 244. Moreover, while the plaintiffs' expert noted that "[c]opies" of the documents "may be found" at the Holocaust Museum, he did not assert that the museum had somehow managed to

compile records as complete or more complete than those of the Hungarian government. J.A. 244–45. Furthermore, the plaintiffs themselves have found no records relevant to their individual cases in the museum, so there is no case-specific reason to discount the defendants' overall submissions on this point. *See Simon v. Republic of Hungary*, No. 10-cv-1770 (D.D.C.), ECF Doc. 122 at 21 n.12. Finally, the examples addressed by the plaintiffs' expert confirm that the pertinent original records are in paper form and written in Hungarian. *See id.*, ECF Doc. 122-1, Exs. 2–6. The district court reasonably assessed the nature and location of the documentary evidence.

The court also reasonably found that there would be "many witnesses" in Hungary who could not or would not travel to the United States. 277 F. Supp. 3d at 65. The plaintiffs had "already sought to depose at least one witness located in Hungary who was unable to travel out of the country," *id.*—an alleged war criminal recently arrested in Budapest, J.A. 79. Given the number and scope of the war crimes alleged in the complaint, and the need for each individual plaintiff to show that any taking of his or her property was done as part of a genocide, *see Simon v. Republic of Hungary* (*Simon II*), 812 F.3d 127, 143–46 (D.C. Cir. 2016), the district court reasonably treated this consideration as significant.

The district court also reasonably considered the appropriateness of a Hungarian forum in the event of further litigation against Rail Cargo Hungaria Zrt. The plaintiffs had sued RCH in this case, but RCH was dismissed for lack of personal jurisdiction in the United States. *See* 277 F. Supp. 3d at 65. In contrast, RCH might be joined to any future litigation in Hungary, producing one case involving all of the original defendants, rather than parallel lawsuits across two continents.

Finally, the district court noted one important competing consideration—the "emotional burden" to the plaintiffs of returning to Hungary. 277 F. Supp. 3d at 65. The court reasoned: "While acknowledging the profound nature of the emotional weight of bringing this case in Hungary, the Court is hesitant to find that this factor outweighs virtually every other factor weighing in favor of dismissing under *forum non conveniens*." *Id.* I can find no abuse of discretion in the court's recognition and balancing of the competing considerations. For where "factors point in different directions, assuming no abuse of discretion in the district court's analysis of the individual factors, it will be the rare case when we can reverse a district court's balancing of the … factors" as itself an abuse of discretion. *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018).

2

With regard to public interests, the district court reasonably concluded that Hungary's interest in resolving this controversy was greater than that of the United States. The Supreme Court has long recognized the "local interest in having localized controversies decided at home." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947); *see, e.g.*, *Piper Aircraft*, 454 U.S. at 260; *MBI*, 616 F.3d at 576. Moreover, this interest is heightened when the claims "arise from events of historical and political significance" to the home forum. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008). This case is "localized" in Hungary; it involves the taking of Hungarians' property by other Hungarians in Hungary. In addition, claims arising out of the Hungarian Holocaust are plainly a matter of historical and political significance to Hungary.

My colleagues object that neither *Pimentel* nor the extraterritoriality and personal-jurisdiction decisions stressing the importance of "a foreign sovereign's interest in resolving disputes internally" were *forum non conveniens* cases. *Ante* at 27–28. But the repeated acknowledgment of this interest—in many different contexts—only reinforces the district court's conclusion. In any event, *Gulf Oil* and its *forum non conveniens* progeny, such as *Piper Aircraft* and *MBI*, amply support the district court's judgment.

My colleagues counter that the United States has recognized a "moral imperative" to provide compensation to Holocaust victims. *Ante* at 29. True enough, but the government seeks to further that interest by encouraging parties "to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation, and cooperation," not by sweeping foreign-centered cases into United States courts. U.S. Br. at 10. Moreover, consistent with *Gulf Oil* and its progeny, the United States reminds us that "a court should give less weight to U.S. interests where the activity at issue occurred in a foreign country and involved harms to foreign nationals." *Id.* at 16. Likewise, it reminds us that "[a]pplication of the forum non conveniens doctrine can assist in identifying cases in which an alternative foreign forum has a closer connection to the underlying parties and/or dispute." *Id.* at 26. These considerations strongly support the district court's assessment of the public-interest factors.

Finally, the district court reasonably concluded that choice-of-law considerations favor a Hungarian forum. Of course, Hungarian law is the obvious source of law to govern acts committed by Hungarians against Hungarians in Hungary. My colleagues express concern that Hungarian law may have affirmatively authorized the discrimination and genocide committed during the Holocaust. *Ante* at 30. But Hungarian

law now outlaws both, 277 F. Supp. 3d at 58, and the defendants affirmatively disavow any defense that genocidal expropriations were lawful in the early 1940s, Oral Arg. Tr. at 22–23, 38.  In sum, there is no bar to Hungarian law governing the merits of this case, which will involve "garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution."  *Simon II*, 812 F.3d at 141.

\* \* \* \*

The district court correctly stated the governing law and reasonably weighed the competing considerations in this case.  Because the court did not abuse its discretion by dismissing on *forum non conveniens* grounds, I would affirm its decision.